# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| STEVE WALLACE; JOE DeLAMIELLEURE and GERRI DeLAMIELLEURE, his wife; RODNEY THOMAS and JEAN THOMAS, his wife; TONY STARGELL; RODNEY McSWAIN; WILLIAM JUDSON; LEON SEARCY; JEFFREY L. WALKER; JAMES JENSEN; HORATIO BLADES and LINDA BLADES, his wife; BRIAN BLADES and TISHA BLADES, his wife; MAURICE TYLER and PENELOPE TYLER, his wife;; DWIGHT STONE and JENNIFER STONE, his wife; GREGORY McCRARY; ROBERT LEE BROWN and DAWN BROWN, his wife; MARK GARALCZYK; HARVEY CLAYTON and CARLA CLAYTON, his wife; HUGH GREEN and GUY GREEN, his wife; WILLIAM and ARNELL HARDISON, his wife; MAURICE SPENCER; AARON D. JONES, II and JANNITA JONES, his wife; STEVE BAACK; COUNCIL RUDOLPH and ANN RUDOLPH, his wife; FRED ANDERSON and DARLA ANDERSON, his wife; MARKEYSIA JONES and SYLVIA JONES, his wife; WILLIAM ROBERTS; AKILI JOHNSON; RICK SANFORD and ALLISON SANFORD, his wife; CORNELL GOWDY; ROBERT BUTLER and CYRILLYN BUTLER, his wife; KENNETH JENKINS and AMY JENKINS, his wife; STANLEY MORGAN and RHOLEDIA MORGAN, his wife; RICH STEPHENS; ROOSEVELT POTTS and TENISHA POTTS, his wife; VAN MALONE and NEDRA MALONE, his wife; ROY GREEN; GEORGE J. CURRY and DAWN CURRY, his wife; BRAD FORD and DANA FORD, his wife; ELMER F. BAILEY; CHIDI AHANATU; JEFF McINTYRE; FLOYD HODGE; ASCOTTI "SCOTT" FIELDS and DONNA FIELDS, his wife; MARC LOGAN; SANDERS SHIVER and PENNY SHIVER, his wife; REGINALD McKENZIE; CHARLEY | CIVIL ACTION NO.<br><br>**COMPLAINT FOR DAMAGES**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVE WALLACE; JOE DeLAMIELLEURE and
GERRI DeLAMIELLEURE, his wife; RODNEY
THOMAS and JEAN THOMAS, his wife; TONY
STARGELL; RODNEY McSWAIN; WILLIAM
JUDSON; LEON SEARCY; JEFFREY L.
WALKER; JAMES JENSEN; HORATIO
BLADES and LINDA BLADES, his wife; BRIAN
BLADES and TISHA BLADES, his wife;
MAURICE TYLER and PENELOPE TYLER, his
wife;; DWIGHT STONE and JENNIFER STONE,
his wife; GREGORY McCRARY; ROBERT LEE
BROWN and DAWN BROWN, his wife; MARK
GARALCZYK; HARVEY CLAYTON and
CARLA CLAYTON, his wife; HUGH GREEN
and GUY GREEN, his wife; WILLIAM and
ARNELL HARDISON, his wife; MAURICE
SPENCER; AARON D. JONES, II and JANNITA
JONES, his wife; STEVE BAACK; COUNCIL
RUDOLPH and ANN RUDOLPH, his wife; FRED
ANDERSON and DARLA ANDERSON, his wife;
MARKEYSIA JONES and SYLVIA JONES, his
wife; WILLIAM ROBERTS; AKILI JOHNSON;
RICK SANFORD and ALLISON SANFORD, his
wife; CORNELL GOWDY; ROBERT BUTLER
and CYRILLYN BUTLER, his wife; KENNETH
JENKINS and AMY JENKINS, his wife;
STANLEY MORGAN and RHOLEDIA
MORGAN, his wife; RICH STEPHENS;
ROOSEVELT POTTS and TENISHA POTTS, his
wife; VAN MALONE and NEDRA MALONE, his
wife; ROY GREEN; GEORGE J. CURRY and
DAWN CURRY, his wife; BRAD FORD and
DANA FORD, his wife; ELMER F. BAILEY;
CHIDI AHANATU; JEFF McINTYRE; FLOYD
HODGE; ASCOTTI "SCOTT" FIELDS and
DONNA FIELDS, his wife; MARC LOGAN;
SANDERS SHIVER and PENNY SHIVER, his
wife; REGINALD McKENZIE; CHARLEY

CIVIL ACTION NO.

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

HARRAWAY and GAIL HARRAWAY, his wife;
PATRICK VENZKE and WILLOW VENZKE, his
wife; LYLE V. BLACKWOOD, JR.; JOHN T.
SMITH and MONICA SMITH, his wife; KEITH
LEE; DAVID PALMER; JOHN EBERSOLE and
JANICE EBERSOLE, his wife; WOODY
THOMPSON and STACY THOMPSON, his wife;
PAUL LAAVEG and NANCY LAAVEG, his
wife; FREDERICK R. HAYES; ROBERT P.
BRUNET and LYDIA BRUNET, his wife; ERIC
CURRY and WILATREAL CURRY, his wife;
KEVIN McLEOD; STEPHEN G. DOIG;

        Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; NFL
PROPERTIES LLC; RIDDELL, INC. d/b/a
RIDDELL SPORTS GROUP, INC., ALL
AMERICAN SPORTS CORPORATION, d/b/a
RIDDELL/ALL AMERICAN; RIDDELL
SPORTS GROUP, INC., EASTON-BELL
SPORTS, INC.; EASTON-BELL SPORTS, LLC;
EB SPORTS CORP.; and RBG HOLDINGS
CORP.; and JOHN DOES 1 through 100,
Inclusive,

        Defendants.

The Plaintiffs, all individuals, hereby complain of Defendants listed above and hereby allege

as follows:

## PARTIES

### Plaintiffs:

1.     Mr. Steve Wallace is a resident of and domiciled in the State of Georgia.

2.     Mr. Joe DeLamielleure and his wife, Gerri, are residents of and domiciled in the

State of North Carolina.

3.     Mr. Rodney Thomas and his wife Jean, are residents of and domiciled in the State of Florida.

4.     Mr. Tony Stargell is a resident of and domiciled in the State of Georgia.

5.     Mr. Rodney McSwain is a resident of and domiciled in the State of North Carolina.

6.     Mr. William Judson is a resident of and domiciled in the State of Georgia.

7.     Mr. Leon Searcy is a resident of and domiciled in the State of Florida.

8.     Mr. Jeffrey L. Walker is a resident of and domiciled in the State of Mississippi.

9.     Mr. James Jensen is a resident of and domiciled in the State of Florida.

10.    Mr. Horatio Blades and his wife, Linda, are residents of and domiciled in the State of Florida.

11.    Mr. Brian Blades and his wife, Tisha, are residents of and domiciled in the State of Florida.

12.    Mr. Maurice Tyler and his wife, Penelope, are residents of and domiciled in the State of Georgia.

13.    Mr. Dwight Stone and his wife, Jennifer, are residents of and domiciled in the State of North Carolina.

14.    Mr. Gregory McCrary is a resident of and domiciled in the State of Georgia.

15.    Mr. Robert Lee Brown and his wife, Dawn, are residents of and domiciled in the State of Maryland.

16.    Mr. Mark Garalczyk is a resident of and domiciled in the State of Arizona.

17.    Mr. Harvey Clayton and his wife, Carla, are residents of and domiciled in the State of Florida.

18.     Mr. Hugh Green and his wife, Guy, are residents of and domiciled in the State of Mississippi.

19.     Mr. William Hardison and his wife, Arnell, are residents of and domiciled in the State of North Carolina.

20.     Mr. Maurice Spencer is a resident of and domiciled in the State of North Carolina.

21.     Mr. Aaron D. Jones, II and his wife, Jannita, are residents of and domiciled in the State of Florida.

22.     Mr. Steve Baack is a resident of and domiciled in the State of Oregon.

23.     Mr. Council Rudolph and his wife, Ann, are residents of and domiciled in the State of Florida.

24.     Mr. Fred Anderson and his wife, Darla, are residents of and domiciled in the State of Washington.

25.     Mr. Markeysia Jones and his wife, Sylvia, are residents of and domiciled in the State of North Carolina.

26.     Mr. William Roberts is a resident of and domiciled in the State of Florida.

27.     Mr. Akili Johnson is a resident of and domiciled in the State of Arkansas.

28.     Mr. Rick Sanford and his wife, Allison, are residents of and domiciled in the State of South Carolina.

29.     Mr. Cornell Gowdy is a resident of and domiciled in the State of Maryland.

30.     Mr. Robert Butler and his wife, Cyrillyn, are residents of and domiciled in the State of Georgia.

31.     Mr. Kenneth Jenkins and his wife, Amy, are residents of and domiciled in the State of Maryland.

32.     Mr. Stanley Morgan and his wife, Rholedia, are residents of and domiciled in the State of Tennessee.

33.     Mr. Rich Stephens is a resident of and domiciled in the state of Missouri.

34.     Mr. Roosevelt Potts and his wife, Tenisha, are residents of and domiciled in the State of Indiana.

35.     Mr. Van Malone and his wife, Nedra, are residents of and domiciled in the State of Oklahoma.

36.     Mr. Roy Green is a resident of and domiciled in the State of Arizona.

37.     Mr. George J. Curry and his wife, Dawn, are residents of and domiciled in the State of Georgia.

38.     Mr. Brad Ford and his wife, Dana, are residents of and domiciled in the State of Alabama.

39.     Mr. Elmer F. Bailey is a resident of and domiciled in the State of Florida.

40.     Mr. Chidi Ahanatu is a resident of and domiciled in the State of Florida.

41.     Mr. Jeff McIntyre is a resident of and domiciled in the State of Arizona.

42.     Mr. Floyd Hodge is a resident of and domiciled in the State of Georgia.

43.     Mr. Ascotti "Scott" Fields and his wife, Donna, are residents of and domiciled in the State of Nevada.

44.     Mr. Marc Logan is a resident of and domiciled in the State of Kentucky.

45.     Mr. Sanders Shiver and his wife, Penny, are residents of and domiciled in the State of Maryland.

46.     Mr. Reginald McKenzie is a resident of and domiciled in the State of Michigan.

47.     Mr. Charley Harraway and his wife, Gail, are residents of and domiciled in the State of Florida.

48.     Mr. Patrick Venzke and his wife, Willow, are residents of and domiciled in the State of Idaho.

49.     Mr. Lyle V. Blackwood, Jr., is a resident of and domiciled in the State of Texas.

50.     Mr. John T. Smith and his wife, Monica, are residents of and domiciled in the State of Arizona.

51.     Mr. Keith Lee is a resident of and domiciled in the State of Florida.

52.     Mr. David Palmer is a resident of and domiciled in the State of Alabama.

53.     Mr. John Ebersole and his wife, Janice, are residents of and domiciled in the State of South Carolina.

54.     Mr. Woody Thompson and his wife, Stacy, are residents of and domiciled in the State of Pennsylvania.

55.     Mr. Paul Laaveg and his wife, Nancy, are residents of and domiciled in the State of Virginia.

56.     Mr. Frederick R. Hayes is a resident of and domiciled in the State of Hawaii.

57.     Mr. Robert P. Brunet and his wife, Lydia, are residents of and domiciled in the State of Louisiana.

58.     Mr. Eric Curry and his wife, Wilatreal, are residents of and domiciled in the State of Florida.

59.     Mr. Kevin McLeod is a resident of and domiciled in the State of Georgia .

60.     Mr. Stephen G. Doig is a resident of and domiciled in the State of Massachusetts.

**Defendants:**

61.    Defendant National Football League ("the NFL") is an unincorporated association with its headquarters located in the State of New York. The NFL regularly conducts business in Pennsylvania.

62.    Defendant NFL Properties, LLC as the successor-in-interest to National Football League Properties Inc. ("NFL Properties") is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties is engaged, among other activities, approving licensing and promoting equipment used by all the NFL teams. NFL Properties regularly conducts business in Pennsylvania.

63.    Defendant Riddell, Inc. (d/b/a Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the State of Illinois, and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL. Riddell, Inc. regularly conducts business in Pennsylvania.

64.    Defendant All American Sports Corporation, d/b/a Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL. All American Sports regularly conducts business in Pennsylvania.

65.    Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 N. State Highway, #300, Irving, Texas 76038. Riddell Sports Group, Inc. regularly conducts business in Pennsylvania.

66.     Defendant Easton-Bell Sports, Inc. is a Delaware Corporation with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406 and is a parent corporation of Riddell Sports Group Inc.  Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.  Easton-Bell Sports, Inc. regularly conducts business in Pennsylvania.

67.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, New York 10019.  Easton-Bell Sports, LLC regularly conducts business in Pennsylvania.

68.     Defendant EB Sports Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406.  EB Sports Corp. regularly conducts business in Pennsylvania.

69.     Defendant RBG Holdings Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406.  RBG Holdings Corp. regularly conducts business in Pennsylvania.

70.     Defendants Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp., shall hereinafter be referred to collectively as "Riddell" or the "Riddell Defendants."

## JURISDICTION AND VENUE

71.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

72.     This Court has personal jurisdiction over Defendants because they engage in business in this District and derive substantial revenue from their contacts with this District.

73.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(2) and 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the Plaintiffs' claims emanated from activities within this jurisdiction and the Defendants conduct substantial business in this jurisdiction.

## INTRODUCTION

### The NFL:

74.     The National Football League was founded as the American Professional Football Association in 1920.

75.     The American Professional Football Association changed its name to the National Football League in 1922.  By 1924, there were 23 franchises or teams that devised the NFL.

76.     The American Football League operated from 1960 to 1969.  In 1970, it merged with the National Football League to create the American Football Conference.

77.     Today, the National Football League consists of two structured conferences, the AFC and the NFC, with 32 team members.

78.     Each team functions as a separate business but operates under shared revenue generated through broadcasting, merchandising and licensing.

79.     The Supreme Court of the United States of America in *American Needle, Inc. v. NFL, et al.,* 130 S.Ct. 2201 (U.S. 2010), ruled that the NFL is a separate entity from each of its teams.

80.     The NFL is by far the most attended domestic sports league in the world by average attendance per game with 67,509 fans per game in the regular season (2009).

81.     The NFL is a 9 billion dollar-a-year business.

**Riddell:**

82.     The Riddell Defendants have operated through designing, developing, manufacturing, selling and distributing football equipment, including helmets, in one form or another, since 1922.

83.     As early as the 1930's, players began using helmets during football games.  These early helmets were constructed from pieces of cobbled leather.

84.     In the early 1940's, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet.  In 1949, plastic helmets became legalized.

85.     Throughout the latter half of the 20th century and continuing to present day, Riddell has designed, developed, manufactured, sold, and distributed equipment used in the NFL, including equipment used by Plaintiffs, including, but not limited to, the following:

(a)     In the 1950's, Riddell manufactured a face-mask component for its helmets, which was eventually patented.

(b)     In 1962, Riddell used a "U" shaped nose protector with a shell (known as the TK2) molded out of polycarbonate.  Riddell also designed an open/closed cell foam and composite liner system for this model to increase the efficiency of the webbed suspension.

(c)     In 1963, Riddell developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head.  The TAK-29 shell, like the TK2, displayed the protective polycarbonate plastic, in addition to including tough shock and cut-resistant face-mask attachment straps.

(d)     In 1969, recognizing that head protection was a key factor in helmet design requiring durable head protection, Riddell constructed a micro-fit helmet model with injection molding technology to create a one-piece shell to improve the structural integrity of the entire helmet.

(e)     In 1973, Riddell developed, designed, manufactured, sold, and/or distributed an air cushion helmet whose interior system consisted of individual vinyl air cushions with layers of fitting and energy absorbing foam.  When a blow was struck, the air in the cushion was expelled through a single vent, greatly reducing the initial impact.  With the exhausting of the air cushion, the compressed fitting foam was further compressed, reducing impact.

(f)     In 1977, Riddell developed, designed, manufactured, sold, and/or distributed a stainless steel face-mask which offered greater bend resistance that prevented helmet breakage at the drill holes.

(g)     In 1981, Riddell developed, designed, manufactured, sold, and/or distributed an Air Cushion Engineered helmet.

(h)     In 1982, Riddell developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding.  On impact, the liquid would be throttled from one cell to the next, resulting in energy attenuation.  The M155 helmet model included one-piece injection-molded face-masks which were mar and rust-resistant, in addition to polyurethane face mask straps and universal jaw pads.

(i)     In 2002, Riddell developed, designed, manufactured, sold, and/or distributed the
        Riddell Revolution helmet designed with the intent of reducing the risk of
        concussion.

(j)     In 2003, Riddell developed, designed, manufactured, sold, and/or distributed a
        real-time, Head Impact Telemetry System (HITS) to monitor and record
        significant incidences of head impact sustained during a football game or practice.
        The system measured the location, magnitude, duration, and direction of head
        acceleration and transmitted that information wirelessly to the sideline.

(k)     In 2006, Riddell provided a research grant to the University of Pittsburgh Medical
        Center for head injury research.  The study compared rates of high school athletes
        who wore the Riddell Revolution helmet with those who wore traditional helmets.

(l)     In 2007, Riddell developed, designed, manufactured, sold, and/or distributed an
        individual helmet system, Revolution IQ Hits$^{TM}$, allowing players to monitor the
        number and severity of impacts received during games and practices.  On-board
        electronics record every impact, allowing players to upload and evaluate each
        occurrence on their home computers.

(m)     In 2001, Riddell developed, designed, manufactured, sold, and/or distributed the
        360 helmet which uses energy-managing materials and a face mask attachment
        system to disperse the energy of frontal impacts.  According to Riddell, it
        developed this helmet using over 1.4 million impacts collected through Riddell's
        HITS technology.

86.     Riddell is currently the official helmet of the NFL.  Upon information and belief, Plaintiffs wore Riddell helmets at times while playing and/or practicing during their NFL careers.

87.     The Riddell Defendants are and were at all times herein mentioned engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs and within the NFL.

## NFL AND THE CBA

88.     Until March of 2011, NFL players were all members of a union called the National Football League Players Association ("NFLPA").  The NFLPA negotiates the general minimum contract for all players in the league with the National Football League Management Council ("NFLMC").  This contract is called the Collective Bargaining Agreement ("CBA") and it is the central document that governs the negotiation of individual player contracts for all of the league's players.  However, historically, the NFL retired players have never been the subject of or a party to Collective Bargaining.

89.     The CBA had been in place since 1993 and was amended in 1998 and again in 2006.  The CBA was originally scheduled to expire at the end of the 2012 season but in 2008 the owners exercised their right to opt-out of the agreement two years earlier.  In 2011, the parties in trying to negotiate a new CBA reached an impasse and the NFL owners locked the players out.  Subsequently, the NFLPA decertified itself as the players' representative for bargaining.

90.     The plaintiffs herein are all retirees and not covered by the CBA nor are they a subject of or parties to bargaining between the NFL and the NFLPA.  Thus, the plaintiffs' claims

are not preempted by federal labor law since the CBA does not apply to their present claims and, additionally, the expired CBA's do not presently exist.

## CTE AND CONCUSSION INJURY

91.     In 2002, Dr. Bennet Omalu, a forensic pathologist and neuropathologist found Chronic Traumatic Encephalopathy (CTE) in the brain of Hall of Famer, Mike Webster.

92.     By 2007, Dr. Omalu found a fourth case linking the death of a former NFL player to CTE brain damage from his football career.

93.     Dr. Omalu says that the brain damage he found in four ex-players who died is the same condition found in punch-drunk boxers.

94.     Around the same time, researchers without NFL ties surveyed retired football players and their findings showed that players who had multiple concussions were more likely to report being diagnosed with depression.

95.     Dr. Omalu questioned "Where was the NFL when we found this disease?"

96.     In 2005-2007, the University of North Carolina's Center for the Study of Retired Athletes published survey-based papers that found a clear correlation between NFL football and depression, dementia and other cognitive impairment.

97.     To date, neuroanatomists have performed autopsies on 13 former NFL players who died after exhibiting signs of degenerative brain disease.  Twelve of these players were found to have suffered from CTE.

98.     The NFL undertook the responsibility of studying concussion research in 1994 through funding a Committee known as the "NFL Committee on Mild Traumatic Brain Injury".

99.     The NFL affirmatively assumed a duty to use reasonable care in the study of post concussion syndrome, and to use reasonable care in the publication of data from the MTBI Committee's work.

100.    Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of negligent and fraudulent conduct.

101.    The NFL Committee on Mild Traumatic Brain Injury published their findings in 2004 showing "no evidence of worsening injury or chronic cumulative effects" from multiple concussions.  In a related study, this Committee found "many NFL players can be safely allowed to return to play" on the day of a concussion if they are without symptoms and cleared by a physician.

102.    Players who suffered concussions were told by the NFL and its agents not to be overly concerned, and were regularly returned to game action mere minutes after sustaining them.

103.    As further evidence, Commissioner Roger Goodell in June of 2007 admitted publicly that the NFL has been studying the effects of traumatic brain injury for "close to 14 years . . ."

104.    It was not until June of 2010 that the NFL acknowledged that concussions can lead to dementia, memory loss, CTE and related symptoms by publishing warning to every player and team.

**NFL'S DUTY TO PLAYERS AND THE PUBLIC**

105.    The NFL overtly undertook a duty to study concussions on behalf of all American Rules Football leagues and players.

106.    As the industry icon, all American Rules Football leagues modeled their programs after the NFL.

107.    In turn, the NFL possesses monopoly power over American Football.  As such, it also possesses monopoly power over the research and education of football injuries to physicians, trainers, coaches and individuals with brain damage such as Plaintiffs who played in the NFL, as well as the public at large.  As a result, it owed a duty to everyone including individuals such as Plaintiffs in the following respects:

(a)    It owed a duty to protect Plaintiffs on the playing field;

(b)    It owed a duty to Plaintiffs to educate them and other players in the NFL about CTE and/or concussion injury;

(c)    It owed a duty to Plaintiffs to educate trainers, physicians, and coaches about CTE and/or concussion injury;

(d)    It owed a duty to Plaintiffs to have in place strict return-to-play   guidelines   to prevent CTE and/or concussion injury;

(e)    It owed a duty to Plaintiffs to promote a "whistleblower" system where teammates would bring to the attention of a trainer,   physician   or   coach   that another player had sustained concussion injury;

(f)    It owed a duty to Plaintiffs to design rules and penalties for players who use their head or upper body to hit or tackle;

(g)    It owed a duty to Plaintiffs to design rules to eliminate the risk of concussion during games and/or practices;

(h)    It owed a duty to Plaintiffs to promote research into and cure for CTE and the effects of concussion injury over a period of time; and

(i)    It owed a duty to State governments, local sports organizations, all American Rules Football leagues and players, and the public at large to protect against the long-term effects of CTE and/or concussion injury.

108.    The NFL knew as early as the 1920's of the harmful effects on a player's brain of concussions; however, until June of 2010 they concealed these facts from coaches, trainers, players, and the public.

109.    Plaintiffs did not know the long-term effects of concussions and relied on the NFL and the Riddell Defendants to protect them.

**NFL'S KNOWLEDGE OF THE RISK OF CONCUSSIONS**

110.    For decades, Defendants have known that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression and CTE and its related symptoms.

111.    This action arises from the Defendants' failure to warn and protect NFL players, such as Plaintiffs against the long-term brain injury risks associated with football-related concussions.

112.    This action arises because the NFL Defendants committed negligence by failing to exercise its duty to enact league-wide guidelines and mandatory rules regulating post-concussion medical treatment and return-to-play standards for players who suffer a concussion and/or multiple concussions.

113.    By failing to exercise its duty to enact reasonable and prudent rules to protect players against the risks associated with repeated brain trauma, the NFL's failure to exercise its independent duty has led to the deaths of some, and brain injuries of many other former players, including Plaintiffs.

114.    The following information, which is by no means comprehensive, was available and easily accessible to Defendants:

(a)    In the 1890's, Admiral Joseph Mason "Bull" Reeves, who is more known as the father of carrier aviation, played American football in the 1890's for the Naval Academy.  He had suffered so many blows to his head that a navy doctor advised him that he could risk death or insanity if he received another kick to his head.

(b)    In 1913, Glenn "Pop" Warner, commented that he had "many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game";

(c)    In 1928, the first case of "Punch Drunk" in boxers was published in the *American Association Journal* by HS Martland;

(d)    A 1937 article on "Dementia puglisistica" was published in the *US Navy Medical Bulletin*;

(e)    A 1952 article on "Electroencephalographic changes in professional boxers was published in the *American Medical Association Journal*;

(f)    A 1952 New England Journal of Medicine Article Vol. 246, pp. 554-556 talked about a three strike rule for concussions in 1945 – three concussions and you should retire from football;

(g)    A 1954 article on "Observations on the clinical and brain wave patterns of professional boxers" was published in the *American Medical Association Journal*;

(h)    A 1956 article on "Diffuse degeneration of the cerebral white matter in severe dementia following head injury" was published in the *Neurological, Neurosurgery and Psychiatry Journal*;

(i)   A 1957 article on the "Medical aspects of boxing, particularly from a neurological standpoint" was published in the *British Medical Journal*;

(j)   A 1959 article on the "Observations of the pathology of insidious dementia following head injury" was published in the *Journal of Mental Science*;

(k)   A 1966 article on "Concussion amnesia" in *Neurology*;

(l)   A 1968 article on "brains of boxers" published in *Neurochirurgia*;

(m)   A 1969 report by the Royal College of Physicians of London confirmed the danger of chronic brain damage occurring in boxers as a result of their careers;

(n)   A 1969 article on "Organic psychosyndromes due boxing" in the *British Journal of Psychiatry*;

(o)   A 1969 book on "Brain damage in boxers – A study of the prevalence of traumatic encephalopathy among ex-professional boxers" by AH Roberts;

(p)   A 1970 article on "retrograde memory immediately after concussion" published in the *Lancet*;

(q)   In 1973, a disabling and sometimes deadly condition involving the second impact concussion occurring before symptoms of a first concussion was described by R.C. Schneider.  This later was coined the Second Impact Syndrome in 1984;

(r)   A 1973 article on "the aftermath of boxing" published in *Psychology Medicine*;

(s)   JA Corsellis, CJ Bruton, D Freeman-Browne, *The Aftermath of Boxing*, 3 Psych. Med. 270-303 (1973);

(t)   A 1974 article on "Cerebral concussion and traumatic unconsciousness, Correlation of experimental and clinical observations of blunt head injuries" published in *Brain*;

19

(u)     A 1974 article on "Traumatic encephalopathy in a young boxer" published in the *Lancet*;

(v)     A 1974 article on "Delayed recovery after mild head injury" was published in the *Lancet*;

(w)     A 1975 article on "cumulative effect of concussion" was published in the *Lancet*;

(x)     J. A. Corsellis, *Brain Damage in Sport*, 1 LANCET 401, 401 (1976) (finding that the brain tissue of fifteen former boxers who sustained multiple head trauma evidenced neuropathological signs of CTE);

(y)     A 1978 article on "Posttraumatic dementia" published in *Aging*;

(z)     J.C. Maroon, P.B. Steele, R. Berlin, *Football Head & Neck Injuries An Update*, 27 Clin. Nurosurg. 414-29 (1980);

(aa)    A 1981 article on "Association football injuries to the brain:   a preliminary report" published in the *British Journal of Sports Medicine*;

(bb)    H Hugenholtz, MT Richard, *Return to Athletic Competition Following Concussion*, 127(9) Can. Med. Assoc. J. 827-29 (1982);

(cc)    RC Cantu, *Guidelines to Return to Contact After Cerebral Concussion*, 14 The Physician and Sports Medicine 75-83 (1986);

(dd)    Daniel N. Kulund, The Injured Athlete 269 (1988).   A boxer may be knocked unconscious by the pain of a shot to the eye or neck during a match. *See id.* Furthermore, a blow to the heart or solar plexus may block the flow of blood and render the fighter unconscious.   Any punches to the temporal region may lead to a loss of balance or dizziness;

(ee)    JA Corsellis, *Boxing and the Brain*, 298 BMJ 105-109 (1989);

(ff)     James P. Kelly et al., *Concussion in Sports, Guidelines for the Prevention of Catastrophic Outcome*, 266 JAMA 2868 (1991);

(gg)     B.E. Leininger & J.S. Kreutzer, *Neuropsychological Outcome of Adults with Mild Traumatic Brain Injury: Implications for Clinical Practice and Research, in* REHABILITATION OF POST-CONCUSSIVE DISORDERS (L.J. Horn & N.D. Zasler eds., State of the Art Reviews, Physical Medicine and Rehabilitation, Hanley & Belfus, Inc. 1992);

(hh)     RC Cantu, *Cerebral Concussion in Sports*, 14(1) Sports Med. 64-74 (1992);

(ii)     RC Cantu, FO Mueller, *Catastrophic Football Injuries  in the USA*, 2(3) Clin. J. Sports Med. 180-85 (1992); and

(jj)     Mild Traumatic Brain Injury Committee of the Head Injury Interdisciplinary Special Interest Group of the American Congress of Rehabilitation Medicine, *Definition of Mild Traumatic Injury*, 8 J. HEAD TRAUMA REHABIL. 86-87 (1993).

115.    In addition, the NFL's duty to protect the health and safety of its players is further underscored by the irrefutable evidence that the NFL has previously enacted the following non-exhaustive list of rules pertaining to players' health and safety:

(a)     In 1956, the NFL enacted a rule that prohibited the grabbing of any player's facemask, other than the ball carrier;

(b)     In 1962, the NFL enacted a rule that prohibited players from grabbing any player's facemask;

(c)     In 1976, the NFL enacted a rule that prohibited players from grabbing the facemask of an opponent.  The penalty for an incidental grasp of the facemask

was 5 yards.  The penalty for twisting, turning, or pulling the facemask was 15 yards.  A player could be ejected from the game if the foul is judged to be vicious and/or flagrant;

(d)   In 1977, the NFL enacted a rule that prohibited players from slapping the head of another player during play.  This rule was referred to as the "Deacon Jones Rule", named after the Rams' defensive end who frequently used this technique;

(e)   In 1977, the NFL enacted a rule that prohibited Offensive Lineman from thrusting their hands into a defender's necks, face, or head;

(f)   In 1979, the NFL enacted a rule that prohibited players from using their helmets to butt, spear, or ram an opponent.  Pursuant to this rule, any player who used the crown or the top of his helmet unnecessarily will be called for unnecessary roughness;

(g)   In 1980, the NFL enacted rule changes that provided greater restrictions on contact in the area of the head, neck, and face;

(h)   In 1980, the NFL enacted rule changes that prohibited players from directly striking, swinging, or clubbing the head, neck and face ("personal foul"). Beginning in 1980, a penalty could be called for such contact whether or not the initial contact was made below the neck area;

(i)   In 1982, the NFL enacted a rule change by which the penalty for incidental grabbing of facemask by a defensive team was changed from 5 yards to an automatic first down plus a 5 yard penalty;

(j)   In 1983, the NFL enacted a rule that prohibited players from using a helmet as weapon to strike or hit an opponent;

(k)     In 1988, the NFL enacted a rule that prohibited defensive players from hitting quarterbacks below the waist while they are still in the pocket.  (The rule was unofficially called the "Andre Waters Rule" based upon a hit that Waters placed on Los Angles quarterback Jim Everett in 1988); and

(l)     Following the 2004-2005 season, the NFL's Competition Committee reviewed video of the entire season and concluded that the horse-collar tackle resulted in six serious injuries.  On May 23, 2005, the NFL owners voted 27-5 to ban the tackle.  The ban states that a horse-collar tackle is an open-field tackle in which a defender uses the shoulder pads to immediately brain a ball carrier down.

## NFL FRAUDUENTLY CONCEALED

## THE LONG-TERM EFFECTS OF CONCUSSIONS

116.     Instead of taking measures to actually protect its players from suffering long-term brain injuries, the NFL created the "Mild Traumatic Brain Injury Committee" in 1994 to purportedly study the effects of concussions on NFL players.

117.     The Mild Traumatic Brain Injury Committee was chaired by Dr. Elliot Pellman, a rheumatologist who is not certified as to brain injuries and/or concussions.

118.     After 14 years of purported studies, and after numerous medical journal articles were written by the NFL's Mild Traumatic Brain Injury Committee (the "NFL's Brain Injury Committee"), concluded that "[b]ecause a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild TBI's in professional football are not serious injuries." *See* "Concussion in professional football: Summary of the research conducted by the National Football League's

Committee on Mild Traumatic Brain Injury," *Neurosurg Focus* 21 (4):E12, 2006, E.J. Pellman and D.C. Viano.

119.    According to the NFL's own committee, the speedy return to play after suffering a concussion demonstrates that such players were not at a greater risk of suffering long-term brain injury.

120.    The MTBI Committee has published multiple research articles since its inception. The findings of the MTBI Committee have regularly contradicted the research and experiences of neurologists who treat sports concussions, and to players who endured them.

121.    For example, in the October 2004 edition of *Neurosurgery*, the MTBI Committee published a paper in which it asserted that the Committee's research found no risk of repeated concussions in players with previous concussions and that there was no "7- to 10-day window of increased susceptibility to sustaining another concussion."

122.    In a comment to the study published in *Neurosurgery*, one doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

123.    As a further example, in January 2005, the Committee wrote that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season."  However, a 2003 NCAA study of 2,905 college football players found just the opposite:  "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

124.    The NFL-funded study is completely devoid of logic and science.    More importantly, it is contrary to their Health and Safety Rules as well as 75 years of published medical literature on concussions.

125.    Between 2002 and 2005, a series of clinical and neuropathological studies performed by independent scientists and physicians demonstrated that multiple NFL induced-concussions cause cognitive problems such as depression, early on-set dementia and CTE and its related symptoms..

126.    In response to these studies, the NFL, to further a scheme of fraud and deceit, had members of the NFL's Brain Injury Committee deny knowledge of a link between concussion and cognitive decline and claim that more time was needed to reach a definitive conclusion on the issue.

127.    When the NFL's Brain Injury Committee anticipated studies that would implicate causal links between concussion and cognitive degeneration it promptly published articles producing contrary findings, although false, distorted and deceiving as part of the NFL's scheme to deceive Congress, the players and the public at large.

128.    Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.   Dr. Omalu in an article in *Neurosurgery* concluded that chronic traumatic encephalopathy ("CTE") triggered by multiple NFL concussions represented a partial cause of their deaths.

129.    In response to Dr. Omalu's article, the NFL acting thru the NFL's Brain Injury Committee, Drs. Ira Casson, Elliott Pellman and David Viano wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

130.   Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the NFL Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline. Dr. Bailes recalled the MTBI Committee's reaction to his presentation: "the Committee got mad . . . we got into it. And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding? Alienate the scientist who found it? Refuse to accept the science coming from him?'"

131.   In 2005, a clinical study performed by Dr. Kevin Guskiewicz found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment.  The NFL's Brain Injury Committee, Dr. Mark Lowell, promptly attacked the article by refusing to accept a survey of 2,400 former NFL players.

132.   A November 2006 *ESPN The Magazine* article described how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players when studying the effects of concussions on the results of such tests. The article further revealed that Dr. Pellman had fired a neuropsychologist for the New York Jets, Dr. William Barr, after Dr. Barr voiced concern that Dr. Pellman might be picking and choosing what data to include in the Committee's research to get results that would downplay the effects of concussions.

133.   Dr. Pellman stepped down as the head of the MTBI Committee in February 2007. Dr. Kevin Guskiewicz, research director of UNC's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

134.   Regarding the work of Dr. Pellman, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or

two you are at increased risk for future concussions;" but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

135.    Dr. Pellman was replaced by Doctors Ira Casson and David Vaino. Dr. Casson continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries. When asked in 2007 whether concussions could lead to brain damage, dementia or depression, Dr. Casson denied the linkage six separate times.

136.    Because of Congressional scrutiny and media pressure, the NFL scheduled a league-wide Concussion Summit for June 2007. At the summit, the co-chair of the MTBI Committee, Dr. Ira Casson, told team doctors and trainers that CTE has never been scientifically documented in football players. Unfortunately, the NFL in keeping with its scheme of fraud and deceit issued a pamphlet to players in August 2007, which stated: "there is no magic number for how many concussions is too many." The pamphlet created player reliance insofar as it also stated "We want to make sure all NFL players . . . *are fully informed* and take advantage of the *most up to date information* and resources as we continue to study the long-term impact on concussions." (emphasis added).

137.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

138.    The NFL, which had commissioned the study, responded to its results by claiming that the study was incomplete. Further findings, it said, would be needed. Several experts in the

field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

139.    When Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players in 2008, Dr. Ira Casson characterized each study as an "isolated incident" from which no conclusion could be drawn.

140.    At the October 2009 Congressional hearings of the House Judiciary Committee, committee member Linda Sanchez analogized the NFL's denial of a causal link between NFL concussion and cognitive decline to the Tobacco industry's denial of the link between cigarette consumption and ill health effects.

141.    Also at the October 2009 hearing, Rep. Maxine Waters stated, "I believe you are an $8 billion organization that has failed in your responsibility to the players.  We all know it's a dangerous sport. Players are always going to get injured. The only question is, are you going to pay for it? I know that you dearly want to hold on to your profits.  I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

142.    NFL Commissioner Roger Goodell testified at the hearing that "[i]n the past 15 years, the N.F.L. has made significant investments in medical and biomechanical research.  All of that information has been made public, subjected to thorough and on-going peer review, published in leading journals, and distributed to the N.F.L.P.A. and their medical consultants. We have been open and transparent, and have invited dialogue throughout the medical community."

143.    In January 2010, the House Judiciary Committee held further hearings on Football Player Head Injuries.   The committee chairman, Rep. John Conyers, Jr., noted that "until

recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

144.     Dr. Casson provided oral and written testimony at the January 2010 hearings. He continued to deny the validity of other studies, stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

145.     Defendants had concealed for decades the serious risks of long-term effects of traumatic brain injury.  It was not until Defendants had to testify before Congress that these eventual admissions were ultimately conceded.  Further, Plaintiffs could not have known or discovered with reasonable certainty that the cause of their injuries were due to Defendants' fraudulent concealment of this information.

146.     Since at least 2002, the NFL Committee has been on direct notice of multiple NFL head injuries contributing to cognitive decline in later life, yet it has never amended the 2007 NFL's Brain Injury Committee statement: "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems. . . It is important to understand that there is no magic number for how many concussions is too many."

147.     As of June 2010, the NFL had yet to amend these inaccurate and misrepresentative statements to any Plaintiff or retiree.

## NFL ACKNOWLEDGES ITS DUTY TO

## PROTECT AGAINST THE LONG-TERM RISK OF CONCUSSIONS

148.     On August 14, 2007, the NFL acknowledged its duty to players by enacting rules to protect them against the risks associated with repeated brain trauma.

149. The NFL's 2007 concussion guidelines, many of which stemmed from an NFL conference in June of 2007 involving team trainers and doctors, were sent to all current players and other team personnel.

150. The NFL's 2007 guidelines on concussion management include a whistle-blower provision for individuals to report concussions with the league so that a player with a head injury is not forced to practice or play against medical advice.

151. The NFL's 2007 concussion guidelines also include an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion. This information was later withdrawn by one of the outside counsel of the NFL in a separate letter to its disability plan, as well as the NFL's August 14, 2007 press release denying that "more than one or two concussions leads to permanent problems".

152. In a statement issued by the NFL on August 14, 2007, Roger Goodell, the Commissioner of the NFL, introduced the NFL's 2007 concussion guidelines by saying, "We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

153. The NFL's Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

154. The NFL's 2007 concussion guidelines provide when a player with a concussion can return to a game or practice.

155.    The NFL's 2007 concussion guidelines specifically mandate that a player should have no concussion symptoms and normal neurological test results before returning to play.

156.    For the past many decades until August 14, 2007, the NFL's duty to protect its players has never changed and has ever waned.  The only change that occurred is that on August 14, 2007, the NFL finally and unequivocally acted upon its longstanding duty to protect its member players by implementing league-wide concussion guidelines.

157.    Importantly, the NFL themselves acknowledged that the 2007 guidelines were inadequate and insufficient.  As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season.  Specifically, the NFL announced new rules on managing concussions requiring players who exhibit any significant concussion signs to be removed from a game or practice and be barred from returning the same day.

158.    Nevertheless, it was not until June of 2010 that the NFL warned any player of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE and its related symptoms.  The Riddell Defendants also failed to so warn active players until approximately the same time frame.

159.    As of today, the NFL Defendants and the Riddell Defendants have never warned any Plaintiff or retired player of the long-term health effects of concussions.


**THE DEFENDANTS' CONDUCT RISES BEYOND MERE NEGLIGENCE**

160.    The aforementioned acts and omissions of the Defendants demonstrate that the Defendants acted with callous indifference to the rights and duties owed to Plaintiffs, all American Rules Football leagues and players and the public at large.

161.    The Defendants acted willfully, wantonly, egregiously, with reckless abandon, and with a high degree of moral culpability.

162.    The conduct of the Defendants was despicable, oppressive, malicious, fraudulent and in conscious disregard of the Plaintiffs' rights, for which the Defendants should be assessed exemplary damages in an appropriate amount to punish and make an example of the Defendants.


## STEVE WALLACE

163.    Plaintiff Steve Wallace was born on December 24, 1964.  He currently resides in Ellenwood, Georgia.

164.    Plaintiff Steve Wallace played Offensive Tackle for the San Francisco 49ers from 1986 to 1996 and for the Kansas City Chiefs in 1997.  He was selected to the Pro Bowl in 1992.

165.    Plaintiff Steve Wallace suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

166.    Plaintiff Steve Wallace was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

167.    Plaintiff Steve Wallace suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short-term memory loss.


## JOE and GERRI DeLAMIELLEURE

168.    Plaintiff Joe DeLamielleure was born on March 16, 1951 in Detroit, Michigan. He is married to Gerri and they currently reside in Charlotte, North Carolina.

169.    Plaintiff Joe DeLamielleure played Offensive Lineman for the Buffalo Bills from 1973 to 1979 and in 1985, and the Cleveland Browns from 1980 to 1984.  He is a six time Pro Bowl member.  He was elected to the Pro Football Hall of Fame in 2003.

170.    Plaintiff Joe DeLamielleure suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

171.    Plaintiff Joe DeLamielleure was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

172.    Plaintiff Joe DeLamielleure suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, depression, hearing loss, mood swings, and ringing in ears.

## RODNEY and JEAN THOMAS

173.    Plaintiff Rodney Thomas was born on December 21, 1965.  He is married to Jean and they currently reside in Coconut Creek, Florida

174.    Plaintiff Rodney Thomas played Defensive Back for the Miami Dolphins from 1988 to 1990, the St. Louis Cardinals in 1991; and the San Francisco 49ers in 1992.

175.    Plaintiff Rodney Thomas suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

176.    Plaintiff Rodney Thomas was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

177.    Plaintiff Rodney Thomas suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, anxiety, depression and confusion.

### TONY STARGELL

178.    Plaintiff Tony Stargell was born on August 7, 1966.  He currently resides in Granitville, Georgia.

179.    Plaintiff Tony Stargell played Defensive Back for the New York Jets from 1990 to 1991, Indianapolis Colts from 1992-1993, the Tampa Bay Buccaneers from 1994 to 1995, the Kansas City Chiefs in 1996, and the Chicago Bears in 1997.

180.    Plaintiff Tony Stargell suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

181.    Plaintiff Tony Stargell was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

182.    Plaintiff Tony Stargell suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, short term memory loss, and sleeplessness.

### RODNEY McSWAIN

183.    Plaintiff Rodney McSwain was born on January 28, 1962.  He currently resides in Hickory, North Carolina.

184.    Plaintiff Rodney McSwain played Defensive Back for the New England Patriots from 1984 to 1990.

185.    Plaintiff Rodney McSwain suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

186.    Plaintiff Rodney McSwain was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

187.    Plaintiff Rodney McSwain suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, migraines and memory loss.

## WILLIAM JUDSON

188.    Plaintiff William Judson was born on March 26, 1959.  He currently resides in Douglasville, Georgia.

189.    Plaintiff William Judson played Corner Back for the Miami Dolphins from 1981 to 1989 and the Detroit Lions from 1990.

190.    Plaintiff William Judson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

191.    Plaintiff William Judson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

192.    Plaintiff William Judson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches and memory loss.

## LEON SEARCY

193.    Plaintiff Leon Searcy was born on December 21, 1969. He is currently resides in Plantation, Florida.

194.    Plaintiff Leon Searcy played Offensive Tackle for the Pittsburgh Steelers from 1992 to 1995, for the Jacksonville Jaguars from 1996 to 2000, and the Baltimore Ravens in 2001 and Miami Dolphins in 2002. He was selected to the Pro Bowl in 1999.

195.    Plaintiff Leon Searcy suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

196.    Plaintiff Leon Search was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

197.    Plaintiff Leon Searcy suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches, and sleeping disorders.

## JEFFREY L. WALKER

198.    Plaintiff Jeffrey L. Walker was born on January 22, 1963. He currently resides in Southaven, Mississippi.

199.    Plaintiff Jeffrey L. Walker played on Offensive Line for the San Diego Chargers from 1986 to 1987 and in 1992, the L.A. Rams from 1987, the New Orleans Saints from 1988 to 1990, and the Phoenix Cardinals in 1991.

200.    Plaintiff Jeffrey L. Walker suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

201.    Plaintiff Jeffrey L. Walker was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

202.    Plaintiff Jeffrey L. Walker suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches, blurred vision, and memory loss.

### JAMES JENSEN

203.    Plaintiff James Jensen was born on November 14, 1958.  He currently resides in Davie, Florida.

204.    Plaintiff James Jensen played Wide Receiver for the Miami Dolphins from 1981 to 1992.  Jim was nicknamed "Crash" based on playing on the kickoff team.

205.    Plaintiff James Jensen suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

206.    Plaintiff James Jensen was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

207. Plaintiff James Jensen suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, PTSD, ringing in ears, and sleeplessness.

## HORATIO "BENNY" and LINDA BLADES

208. Plaintiff Horatio "Benny" Blades was born on September 3, 1966. He is married to Linda and they currently reside in Lauderhill, Florida.

209. Plaintiff Horatio "Benny" Blades played Safety for the Detroit Lions from 1988 to 1996 and the Seattle Seahawks in 1997. He was selected to the Pro Bowl in 1991.

210. Plaintiff Horatio "Benny" Blades suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

211. Plaintiff Horatio "Benny" Blades was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

212. Plaintiff Horatio "Benny" Blades suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, memory loss, and blurred vision.

## BRIAN and TISHA BLADES

213. Plaintiff Brian Blades was born on July 25, 1965. He is married to Tisha and they currently reside in Plantation, Florida.

214.    Plaintiff Brian Blades played Wide Receiver for the Seattle Seahawks from 1988 to 1998.  He was selected to the Pro Bowl in 1989.

215.    Plaintiff Brian Blades suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

216.    Plaintiff Brian Blades was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

217.    Plaintiff Brian Blades suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, blurred vision, and short term memory loss.

### MAURICE and PENELOPE TYLER

218.    Plaintiff Maurice Tyler was born on July 19, 1950. He is married to Penelope and they currently reside in Ellenwood, Georgia.

219.    Plaintiff Maurice Tyler played Corner Back for the Buffalo Bills in 1972, the Denver Broncos from 1973 to 1974, the San Diego Chargers in 1975, the Detroit Lions in 1976, the New York Jets in 1997, the New York Giants in 1978.

220.    Plaintiff Maurice Tyler suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

221.    Plaintiff Maurice Tyler was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

222. Plaintiff Maurice Tyler suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### DWIGHT and JENNIFER STONE

223. Plaintiff Dwight Stone was born on January 2, 1964. He is married to Jennifer and they currently reside in Waxhaw, North Carolina

224. Plaintiff Dwight Stone played Wide Receiver for the Pittsburgh Steelers from 1987 to 1994, the Carolina Panthers from 1995 to 1998, and the New York Jets from 1999 to 2000.

225. Plaintiff Dwight Stone suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

226. Plaintiff Dwight Stone was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

227. Plaintiff Dwight Stone suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, mood swings and memory loss.

### GREGORY McCRARY

228. Plaintiff Gregory McCrary was born on March 24, 1952. He currently resides in Stone Mountain, Georgia.

229.    Plaintiff Gregory McCrary played Tight End for the Atlanta Falcons from 1975-1977, the San Diego Chargers from 1978-1980, the Washington Redskins in 1978 and 1981, and the Oakland Raiders in 1982.

230.    Plaintiff Gregory McCrary suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

231.    Plaintiff Gregory McCrary was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

232.    Plaintiff Gregory McCrary suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleep problems, headaches, blurred vision, ringing in ears, and lack of focus.

## ROBERT LEE and DAWN BROWN

233.    Plaintiff Robert Lee Brown was born on May 21, 1960.  He is married to Dawn and they currently reside in Columbia, Maryland.

234.    Plaintiff Robert Lee Brown played Defensive End for the Green Bay Packers from 1982 to 1992.

235.    Plaintiff Robert Lee Brown suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

236.    Plaintiff Robert Lee Brown was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

237.    Plaintiff Robert Lee Brown suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches and mood swings.

## MARK GARALCZYK

238.    Plaintiff Mark Garalczyk was born on August 12, 1964.  He currently resides in Scottsdale, Arizona.

239.    Plaintiff Mark Garalczyk played Defensive End for the St. Louis Cardinals in 1987, the New York Jets in 1988, the Phoenix Cardinals in 1988, and the Indianapolis Colts in 1991.

240.    Plaintiff Mark Garalczyk suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

241.    Plaintiff Mark Garalczyk was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

242.    Plaintiff Mark Garalczyk suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, and headaches.

## HARVEY and CARLA CLAYTON

243.    Plaintiff Harvey Clayton was born on April 4, 1961.  He is married to Carla and they currently reside in Miami, Florida.

244.   Plaintiff Harvey Clayton played Defensive Back for the Pittsburgh Steelers from 1983 to 1986 and the New York Giants from 1987 to 1988.

245.   Plaintiff Harvey Clayton suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

246.   Plaintiff Harvey Clayton was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

247.   Plaintiff Harvey Clayton suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, blurred vision, headaches, and ringing in ears.

### HUGH and GUY GREEN

248.   Plaintiff Hugh Green was born on July 27, 1959.  He is married to Guy and they currently reside in Fayette, Mississippi.

249.   Plaintiff Hugh Green played Linebacker for the Tampa Bay Buccaneers from 1981 to 1985 and the Miami Dolphins from 1985 to 1991.  He was selected to two Pro Bowls.

250.   Plaintiff Hugh Green suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

251.   Plaintiff Hugh Green was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

252.    Plaintiff Hugh Green suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, migraines, memory loss, blurred vision, and ringing in ears.

## WILLIAM and ARNELL HARDISON

253.    Plaintiff William Hardison was born on May 2, 1956. He is married to Arnell and they currently reside in Linden, North Carolina.

254.    Plaintiff William Hardison played Defensive End for the Buffalo Bills from 1978 to 1980, the New York Giants from 1982 to 1985, the San Diego Chargers from 1986 to 1987, and the Kansas City Chiefs in 1988.

255.    Plaintiff William Hardison suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

256.    Plaintiff William Hardison was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

257.    Plaintiff William Hardison suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, ringing in ears, and headaches.

## MAURICE SPENCER

258.    Plaintiff Maurice Spencer was born on June 15, 1952. He currently resides in Winston-Salem, North Carolina.

259.   Plaintiff Maurice Spencer played Cornerback for the New Orleans Saints from 1974 to 1980.

260.   Plaintiff Maurice Spencer suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

261.   Plaintiff Maurice Spencer was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

262.   Plaintiff Maurice Spencer suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, tingling, and dizziness.

### AARON D. II and JANNITA JONES

263.   Plaintiff Aaron D. Jones II was born on December 18, 1967.  He is married to Jannita and they currently reside in Orlando, Florida.

264.   Plaintiff Aaron D. Jones II played Linebacker for the Pittsburgh Steelers from 1988 to 1992, the New England Patriots from 1993 to 1995, and the Miami Dolphins in 1996.

265.   Plaintiff Aaron D. Jones II suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

266.   Plaintiff Aaron D. Jones II was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

267.    Plaintiff Aaron D. Jones II suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to short term memory loss, ringing in his ears and anxiety.

**STEVE BAACK**

268.    Plaintiff Steve Baack was born on November 16, 1960.  He currently resides in Beaverton, Oregon.

269.    Plaintiff Steve Baack played Defensive Tackle and Nose Tackle for the Detroit Lions from 1984 to 1989.

270.    Plaintiff Steve Baack suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

271.    Plaintiff Steve Baack was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

272.    Plaintiff Steve Baack suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, anxiety and blurred vision.

**COUNCIL and ANN RUDOLPH**

273.    Plaintiff Council Rudolph was born on January 18, 1950.  He is married to Ann and they currently reside in Tampa, Florida.

274.    Plaintiff Council Rudolph played Defensive End for the Houston Oilers in 1972, the St. Louis Cardinals from 1973 to 1975, and the Tampa Bay Buccaneers from 1976 to 1977.

275.    Plaintiff Council Rudolph suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

276.    Plaintiff Council Rudolph was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

277.    Plaintiff Council Rudolph suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short term memory loss, headaches, PTSD and sleeplessness.

## FRED and DARLA ANDERSON

278.    Plaintiff Fred Anderson was born on October 30, 1954.  He is married to Darla and they currently reside in Kirkland, Washington.

279.    Plaintiff Fred Anderson played Defensive Lineman for the Pittsburgh Steelers from 1978 to 1979 and the Seattle Seahawks from 1980 to 1982.

280.    Plaintiff Fred Anderson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

281.    Plaintiff Fred Anderson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

282.    Plaintiff Fred Anderson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches, ringing in ears, blurred vision, and depression.

## MARKEYSIA "DONTA" and SYLVIA JONES

283.    Plaintiff Markeysia "Donta" Jones was born on August 27, 1972.  He is married to Sylvia and they currently reside in Mathews, North Carolina.

284.    Plaintiff Markeysia "Donta" Jones played Linebacker for the Pittsburgh Steelers from 1995 to 1999, the Carolina Panthers from 1999 to 2000, and the New Orleans Saints from 2000 to 2001.

285.    Plaintiff Markeysia "Donta" Jones suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

286.    Plaintiff Markeysia "Donta" Jones was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

287.    Plaintiff Markeysia "Donta" Jones suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, migraines, sleeping problems and memory loss.

## WILLIAM ROBERTS

288.    Plaintiff William Roberts was born on August 5, 1962.  He currently resides in Hialeah, Florida.

48

289.   Plaintiff William Roberts played Offensive Lineman for the New York Giants from 1984 to 1994, the New England Patriots from 1995 to 1996, and the New York Jets from 1997 to 1998. He was selected to the Pro Bowl in 1990.

290.   Plaintiff William Roberts suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

291.   Plaintiff William Roberts was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

292.   Plaintiff William Roberts suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, blurred vision, headaches, and sleep problems.

### AKILI "AJ" JOHNSON

293.   Plaintiff Akili "AJ" Johnson was born on May 10, 1972. He currently resides in Little Rock, Arkansas.

294.   Plaintiff Akili "AJ" Johnson played Corner Back for the New York Giants in 1995 and Atlanta Falcons in 1996.

295.   Plaintiff Akili "AJ" Johnson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

296.   Plaintiff Akili "AJ" Johnson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

297.    Plaintiff Akili "AJ" Johnson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches and memory loss.

## RICK and ALLISON SANFORD

298.    Plaintiff Rick Sanford was born on September 1, 1957. He is married to Allison and they currently reside in Irmo, South Carolina.

299.    Plaintiff Rick Sanford played Free Safety for the New England Patriots from 1979 to 1984 and the Seattle Seahawks in 1985.

300.    Plaintiff Rick Sanford suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

301.    Plaintiff Rick Sanford was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

302.    Plaintiff Rick Sanford suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, depression, headaches, and memory loss.

## CORNELL GOWDY

303.    Plaintiff Cornell Gowdy was born on October 20, 1963. He currently resides in Suitland, Maryland.

304.    Plaintiff Cornell Gowdy played Defensive Back for the Dallas Cowboys in 1986 and the Pittsburgh Steelers from 1987 to 1988.

305.   Plaintiff Cornell Gowdy suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

306.   Plaintiff Cornell Gowdy was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

307.   Plaintiff Cornell Gowdy suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, speech difficulties, short term memory loss, and blurred vision.

## ROBERT "BOBBY" and CYRILLYN BUTLER

308.   Plaintiff Robert "Bobby" Butler was born on May 28, 1959.  He is married to Cyrillyn and they currently reside in Norcross, Georgia.

309.   Plaintiff Robert "Bobby" Butler played Cornerback for the Atlanta Falcons from 1981 to 1992.

310.   Plaintiff Robert "Bobby" Butler suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

311.   Plaintiff Robert "Bobby" Butler was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

312.    Plaintiff Robert "Bobby" Butler suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches, and blurred vision.

## KENNETH and AMY JENKINS

313.    Plaintiff Kenneth Jenkins was born on May 8, 1959.  He is married to Amy and they reside in Bowie, Maryland.

314.    Plaintiff Kenneth Jenkins played running back in 1982 for the Philadelphia Eagles, from 1983 to 1984 for the Detroit Lions and from 1985 to 1986 for the Washington Redskins.

315.    Plaintiff Kenneth Jenkins suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

316.    Plaintiff Kenneth Jenkins was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

317.    Plaintiff Kenneth Jenkins suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short term memory loss and headaches.

## STANLEY and RHOLEDIA MORGAN

318.    Plaintiff Stanley Morgan on February 17, 1955.  He is married to Rholedia Morgan and they reside in Germantown, Tennessee.

319.   Plaintiff Stanley Morgan played wide receiver from 1977 to 1989 for the New England Patriots and from 1990 for the Indianapolis Colts.  He was selected to the Pro Bowl on four occasions.

320.   Plaintiff Stanley Morgan suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

321.   Plaintiff Stanley Morgan was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

322.   Plaintiff Stanley Morgan suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short term memory loss and migraines.

## RICH STEPHENS

323.   Plaintiff Rich Stephens was born on November 1, 1965.  He currently resides in High Ridge, Missouri.

324.   Plaintiff Rich Stephens played for the Los Angeles Rams from 1992 to 1996.

325.   Plaintiff Rich Stephens suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

326.   Plaintiff Rich Stephens was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

327.   Plaintiff Rich Stephens suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, double vision, headaches and memory loss.

## ROOSEVELT and TENISHA POTTS

328.   Plaintiff Roosevelt Potts was born on January 8, 1972.  He is married to Tenisha and they currently reside in Fishers, Indiana.

329.   Plaintiff Roosevelt Potts played Running Back for the Indianapolis Colts from 1992 to 1997, the Miami Dolphins from 1997 to 1998, and the Baltimore Colts from 1998 to 1999.

330.   Plaintiff Roosevelt Potts suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

331.   Plaintiff Roosevelt Potts was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

332.   Plaintiff Roosevelt Potts suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss and sleep disorder.

## VAN and NEDRA MALONE

333.   Plaintiff Van Malone was born on July 1, 1970.  He is married to Nedra and they currently reside in Broken Arrow, Oklahoma.

334.   Plaintiff Van Malone played Safety for the Detroit Lions from 1994 to 1997 and the Arizona Cardinals in 1998.

335.    Plaintiff Van Malone suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

336.    Plaintiff Van Malone was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

337.    Plaintiff Van Malone suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches, ringing in ears, mild depression, mood swings, vision problems, and inability to maintain focus.

### ROY GREEN

338.    Plaintiff Roy Green was born on June 30, 1957.  He currently resides in Phoenix, Arizona.

339.    Plaintiff Roy Green played Defensive Back, Wide Receiver and Kick Returner for the Arizona and St. Louis Cardinals from 1979 to 1990 and the Philadelphia Eagles from 1990 to 1992.

340.    Plaintiff Roy Green suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

341.    Plaintiff Roy Green was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

342.   Plaintiff Roy Green suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short-term memory loss, dizziness and fainting spells.

## GEORGE J. "BUDDY" and DAWN CURRY

343.   Plaintiff George J. "Buddy" Curry was born on June 4, 1958.  He is married to Dawn and they currently reside in Buford, Georgia.

344.   Plaintiff George J. "Buddy" Curry played Linebacker for the Atlanta Falcons from 1980 to 1987.

345.   Plaintiff George J. "Buddy" Curry suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

346.   Plaintiff George J. "Buddy" Curry was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

347.   Plaintiff George J. "Buddy" Curry suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

## BRAD and DANA FORD

348.   Plaintiff Brad Ford was born on January 11, 1974.  He is married to Dana and they currently reside in Dadeville, Alabama.

349.   Plaintiff Brad Ford played Defensive Back for the Detroit Lions from 1996 to 1998.

350.    Plaintiff Brad Ford suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

351.    Plaintiff Brad Ford was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.   This was a substantial factor in causing his current injury.

352.    Plaintiff Brad Ford suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short-term memory loss, headaches, sleep disorder and depression.

### ELMER F. BAILEY

353.    Plaintiff Elmer F. Bailey was born on December 13, 1957.  He currently resides in North Miami, Florida.

354.    Plaintiff Elmer F. Bailey played Wide Receiver for the Miami Dolphins from 1980 to 1981 and for the Baltimore Colts in 1982.

355.    Plaintiff Elmer F. Bailey suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

356.    Plaintiff Elmer F. Bailey was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

357.    Plaintiff Elmer F. Bailey suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches and sleep disorder.

## CHIDI AHANATU

358.    Plaintiff Chidi Ahanatu was born on October 11, 1970.  He currently resides in Tampa, Florida.

359.    Plaintiff Chidi Ahanatu played Nose Tackle for the Tampa Bay Buccaneers from 1993 to 2000 and in 2004, the St. Louis Rams in 2001, the Buffalo Bills in 2002, the San Francisco 49ers in 2003, and the Miami Dolphins in 2004.

360.    Plaintiff Chidi Ahanatu suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

361.    Plaintiff Chidi Ahanatu was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

362.    Plaintiff Chidi Ahanatu suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, severe headaches, anxiety, depression, memory loss and lack of focus.


## JEFF McINTYRE

363.    Plaintiff Jeff McIntyre was born on September December 24, 1964.  He currently resides in Phoenix, Arizona.

364.    Plaintiff Jeff McIntyre played Offensive Tackle for the San Francisco 49ers from 1986 to 1996 and for the Kansas City Chiefs in 1997.

365.    Plaintiff Jeff McIntyre suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

366.    Plaintiff Jeff McIntyre was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

367.    Plaintiff Jeff McIntyre suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short-term memory loss.

## FLOYD HODGE

368.    Plaintiff Floyd Hodge was born on July 18, 1959.  He currently resides in Lawrenceville, Georgia.

369.    Plaintiff Floyd Hodge played Wide Receiver for the Atlanta Falcons from 1981 to 1985.

370.    Plaintiff Floyd Hodge suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

371.    Plaintiff Floyd Hodge was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

372.    Plaintiff Floyd Hodge suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, dizziness and memory loss.

## ASCOTTI "SCOTT" and DONNA FIELDS

373.    Plaintiff Ascotti "Scott" Fields was born on April 22, 1973.  He is married to Donna and they currently reside in Las Vegas, Nevada.

374.    Plaintiff Ascotti "Scott" Fields played Linebacker for the Atlanta Falcons in 1996, the Tampa Bay Buccaneers in 1998, and the Seattle Seahawks in 1999.

375.    Plaintiff Ascotti "Scott" Fields suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

376.    Plaintiff Ascotti "Scott" Fields was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

377.    Plaintiff Ascotti "Scott" Fields suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches, dizziness and short-term memory loss.

## MARC LOGAN

378.    Plaintiff Marc Logan was born on May 9, 1965.  He currently resides in Lexington, Kentucky.

379.    Plaintiff Marc Logan played Running Back for the Cincinnati Bengals from 1987 to 1988, for the Miami Dolphins from 1989 to 1991, the San Francisco 49ers from 1992 to 1994, and the Washington Redskins from 1995 to 1997.

380.    Plaintiff Marc Logan suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

381.    Plaintiff Marc Logan was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

382.    Plaintiff Marc Logan suffers from multiple past traumatic brain injuries with various symptoms.

## SANDERS and PENNY SHIVER

383.    Plaintiff Sanders Shiver was born on February 14, 1955.  He is married to Penny and they currently reside in Bowie, Maryland.

384.    Plaintiff Sanders Shiver played Linebacker for the Baltimore Colts from 1976 to 1983 and the Miami Dolphins from 1984 to 1985.

385.    Plaintiff Sanders Shiver suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

386.    Plaintiff Sanders Shiver was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

387.    Plaintiff Sanders Shiver suffers from multiple past traumatic brain injuries with various symptoms.

## REGINALD McKENZIE

388.   Plaintiff Reginald McKenzie was born on July 27, 1950.  He currently resides in Detroit, Michigan.

389.   Plaintiff Reginald McKenzie played Guard for the Buffalo Bills from 1972 to 1982 and for the Seattle Seahawks from 1983 to 1984.

390.   Plaintiff Reginald McKenzie suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

391.   Plaintiff Reginald McKenzie was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

392.   Plaintiff Reginald McKenzie suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, forgetfulness, blurred vision, and anxiety attacks.

## CHARLEY and GAIL HARRAWAY

393.   Plaintiff Charley Harraway was born on September 21, 1944.  He is married to Gail and they currently reside in Sarasota, Florida.

394.   Plaintiff Charley Harraway played Full Back for the Cleveland Browns from 1966 to 1968 and for the Washington Redskins from 1969 to 1973.

395.   Plaintiff Charley Harraway suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

396.   Plaintiff Charley Harraway was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

397.   Plaintiff Charley Harraway suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss and headaches.

### PATRICK and WILLOW VENZKE

398.   Plaintiff Patrick Venzke was born on April 6, 1975.  He is married to Willow and they currently reside in Moscow, Idaho.

399.   Plaintiff Patrick Venzke played Right Tackle for the Jacksonville Jaguars from 2001 to 2002, the Philadelphia Eagles in 2002, and the Indianapolis Colts from 2003 to 2004.

400.   Plaintiff Patrick Venzke suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

401.   Plaintiff Patrick Venzke was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

402.   Plaintiff Patrick Venzke suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, anxiety attacks, mood swings, depression and inability to focus.

### LYLE V. BLACKWOOD, JR.

403.    Plaintiff Lyle V. Blackwood, Jr. was born on May 24, 1951.  He currently resides in Dallas, Texas.

404.    Plaintiff Lyle V. Blackwood, Jr. played Safety for the Cincinnati Bengals from 1973 to 1975, for the Seattle Seahawks in 1976, for the Baltimore Colts from 1977 to 1980, and the Miami Dolphins from 1981 to 1986.

405.    Plaintiff Lyle V. Blackwood, Jr. suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

406.    Plaintiff Lyle V. Blackwood, Jr. was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

407.    Plaintiff Lyle V. Blackwood, Jr. suffers from multiple past traumatic brain injuries with various symptoms.


**JOHN T. and MONICA SMITH**

408.    Plaintiff John T. Smith was born on October 29, 1955.  He is married to Monica and they currently reside in Buckeye, Arizona.

409.    Plaintiff John T. Smith played Wide Receiver and Punt Returner for the Washington Redskins in 1978, the Kansas City Chiefs from 1978 to 1984, and the St. Louis/Phoenix Cardinals from 1985 to 1990.

410.   Plaintiff John T. Smith suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

411.   Plaintiff John T. Smith was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

412.   Plaintiff John T. Smith suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

**KEITH LEE**

413.   Plaintiff Keith Lee was born on December 22, 1957.  He currently resides in Oviedo, Florida.

414.   Plaintiff Keith Lee played Defensive Back for the Buffalo Bills in 1980, the New England Patriots from 1981 to 1985, and the Baltimore Colts in 1985.

415.   Plaintiff Keith Lee suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

416.   Plaintiff Keith Lee was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

417.   Plaintiff Keith Lee suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short-term memory loss and headaches.

**DAVID PALMER**

418.    Plaintiff David Palmer was born on November 19, 1972.  He currently resides in Birmingham, Alabama.

419.    Plaintiff David Palmer played Running Back with the Minnesota Vikings from 1994 to 2000.

420.    Plaintiff David Palmer suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

421.    Plaintiff David Palmer was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

422.    Plaintiff David Palmer suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, migraines.

### JOHN and JANICE EBERSOLE

423.    Plaintiff John Ebersole was born on November 5, 1948. He is married to Janice and they currently reside in Mt. Pleasant, South Carolina.

424.    Plaintiff John Ebersole played Linebacker for the New York Jets from 1970 to 1977.

425.    Plaintiff John Ebersole suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

426.    Plaintiff John Ebersole was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

427.   Plaintiff John Ebersole suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

## WOODY and STACY THOMPSON

428.   Plaintiff Woody Thompson was born on August 20, 1952. He is married to Stacy and they currently reside in Erie, Pennsylvania.

429.   Plaintiff Woody Thompson played Running Back for the Atlanta Falcons from 1975 to 1977.

430.   Plaintiff Woody Thompson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

431.   Plaintiff Woody Thompson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

432.   Plaintiff Woody Thompson suffers from multiple past traumatic brain injuries with various symptoms.

## PAUL and NANCY LAAVEG

433.   Plaintiff Paul Laaveg was born on October 1, 1948. He is married to Nancy and they currently reside in Berryville, Virginia.

434.   Plaintiff Paul Laaveg played Guard for the Washington Redskins from 1970 to 1977.

435.    Plaintiff Paul Laaveg suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

436.    Plaintiff Paul Laaveg was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

437.    Plaintiff Paul Laaveg suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss and ringing in ears.

## FREDERICK R. "RICK" HAYES

438.    Plaintiff Frederick R. "Rick" Hayes was born on July 30, 1951.  He currently resides in Kapaa, Hawaii.

439.    Plaintiff Frederick R. "Rick" Hayes played Offensive Left Tackle for the Los Angeles Rams from 1974 to 1976.

440.    Plaintiff Frederick R. "Rick" Hayes suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

441.    Plaintiff Frederick R. "Rick" Hayes was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

442.    Plaintiff Frederick R. "Rick" Hayes suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

## ROBERT P. and LYDIA BRUNET

443.    Plaintiff Robert P. Brunet was born on July 29, 1946.  He is married to Lydia and they currently reside in Denham Spring, Louisiana.

444.    Plaintiff Robert P. Brunet played Running Back for the Washington Redskins from 1968 to 1977.

445.    Plaintiff Robert P. Brunet suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

446.    Plaintiff Robert P. Brunet was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

447.    Plaintiff Robert P. Brunet suffers from multiple past traumatic brain injuries with various symptoms.

## ERIC and WILATREAL CURRY

448.    Plaintiff Eric Curry was born on February 3, 1970.  He is married to Wilatreal and they currently reside in Jacksonville, Florida.

449.    Plaintiff Eric Curry played Defensive End for the Tampa Bay Buccaneers from 1993 to 1998 and the Jacksonville Jaguars from 1998 to 2001.

450.    Plaintiff Eric Curry suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

451.    Plaintiff Eric Curry was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-

mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

452.    Plaintiff Eric Curry suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, dizziness and ringing in ears.

## KEVIN McLEOD

453.    Plaintiff Kevin McLeod was born on October 17, 1974. He currently resides in Atlanta, Georgia.

454.    Plaintiff Kevin McLeod played Linebacker for the Jacksonville Jaguars, the Tampa Bay Buccaneers and the Atlanta Falcons.

455.    Plaintiff Kevin McLeod suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

456.    Plaintiff Kevin McLeod was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

457.    Plaintiff Kevin McLeod suffers from multiple past traumatic brain injuries with various symptoms.

## STEPHEN G. DOIG

458.    Plaintiff Stephen G. Doig was born on March 28, 1960. He currently resides in North Reading, Massachusetts.

459.    Plaintiff Stephen G. Doig played Linebacker for the Detroit Lions and New England Patriots from 1982 to 1987.

460. Plaintiff Stephen G. Doig suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

461. Plaintiff Stephen G. Doig was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

462. Plaintiff Stephen G. Doig suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, Headaches, depression, anxiety, ringing in ears, sleeplessness, short term memory loss and dizziness.

## FIRST CAUSE OF ACTION

## NEGLIGENCE - Monopolist

## (As Against the NFL)

463. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein at length.

464. The NFL, by and through its monopoly power, has historically had a duty to invoke rules that protect the health and safety of its players, including Plaintiffs, and the public, including but not limited to, a duty to use reasonable care in researching, studying and/or examining the dangers and risks of head injuries and/or concussions to NFL players, to inform and warn their players of such risks and to effectuate reasonable league policies and/or take other reasonable action to minimize the risks of head injuries.

465.     The NFL affirmatively and voluntarily established the MTBI Committee to examine the dangers and consequences of head injuries to NFL players, to report on its findings, to provide information and guidance from its research and studies concerning concussions to teams and players, and to make recommendations to lessen the risks of concussions.  The NFL is responsible for the staffing and conduct of the MTBI Committee

466.     As a monopoly, the NFL has a duty to protect the health and safety of its players, as well as the public at large.

467.     Throughout the history of the NFL, the NFL organization has consistently breached its duty to protect the health and safety of its players by failing to enact rules, policies and regulations to best protect its players.

468.     The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by failing to implement standardized post-concussion guidelines by failing to enact rules to decrease the risk of concussions during games or practices, and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game and being placed at further risk of injury.

469.     Throughout its many years, the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risk exists.  Until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer concussive brain injuries.

470.     It has been well established since 1928 that repeated blows to the head can lead to CTE, commonly known as "punch drunk syndrome."  Punch Drunk Syndrome has been prevalent in boxers who have repeatedly suffered concussions.

471.     Despite the fact that other sporting associations exist, such as the National Hockey League and the World Boxing Association, which have decades ago established standardized association-wide concussion management rules, until August 14, 2007, the NFL failed to establish any guidelines or policies to protect the mental health and safety of its players.

472.     Nonetheless, it took the NFL until June of 2010 to finally acknowledge the long-term risks associated with concussions, including dementia, memory loss, CTE and its related symptoms.  At that time, the NFL warned active players of those risks.  To date, the NFL has never warned any past players, including Plaintiffs, or the public of the long- term brain injury caused from concussions.

473.     The NFL's failure to fulfill its duty to protect its players, the plaintiffs and the public, include, but are not limited to, the following failures:

(a)     Failure to use reasonable care in the manner in which it created the MTBI Committee and in the appointment of physicians to head the Committee who were not qualified;

(b)     Failure to use reasonable care in researching, studying and/or examining the risks of head injuries and/or concussions in professional football and in downplaying and in many cases denying both the severity of such injuries and the clear link between concussions and brain damage, thereby breaching its duty to their players, including the Plaintiffs;

(c)     Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

(d)    Failure to regulate and monitor practices, games, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs;

(e)    Failure to require that an adequate concussive brain injury history be taken of NFL players;

(f)    Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

(g)    Failure to invoke league-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury, and the return to play insofar as such matters pertain to concussive brain injury;

(h)    Failure to properly inform the public and other American Rules Football leagues and players of the health risks associated with concussive injury;

(i)    Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury; and

(j)    Failure to warn of the harm of repetitive concussion injuries.

474.    The NFL breached its duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

475.    The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

476.    If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved

with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, then NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects of that condition, would have recovered more rapidly, or would not have suffered long-term brain injuries.

477.    Under all of the above circumstances, it was foreseeable that the NFL's violating its duties would cause or substantially contribute to the personal injuries suffered by Plaintiffs.

478.    The NFL committed acts of omission and commission, which collectively and severally, constituted negligence.  The NFL's negligence was a proximate and producing cause of the personal injuries and other damages suffered by Plaintiffs.

479.    As a result of the personal injuries, Plaintiffs are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## SECOND CAUSE OF ACTION

## NEGLIGENCE - Monopolist

## (As Against the NFL)

480.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein at length.

481.    The NFL has historically assumed an independent tort duty to invoke rules that protect the health and safety of its players, but it has violated Section 323 of the Restatement (Second) of Torts.

482.    Throughout the history of the NFL, the NFL organization has consistently exercised its duty to protect the health and safety of its players by implementing rules, policies and regulations in an attempt to best protect its players.

483. By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safety of its players when known and foreseeable risks exist.

484. The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game or practice.

485. Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

486. It has been well established since 1928 that repeated blows to the head can lead to CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent in boxers who have repeatedly suffered concussions.

487. Despite the fact that other sporting associations exist, such as the World Boxing Association, which have decades ago established standardized association-wide concussion management rules, until August 14, 2007, the NFL failed to establish any guidelines or policies to protect the mental health and safety of its players.

488. The NFL's failure to fulfill its assumed duty to protect its players includes but is not limited to the following failures:

(a)     Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

(b)     Failure to regulate and monitor practice, games, rules, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs;

(c)     Failure to require that an adequate concussive brain injury history be taken of NFL players;

(d)     Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

(e)     Failure to invoke league-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury, and the return to play insofar as such matters pertain to concussive brain injury; and,

(f)     Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury.

489.    The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

490.    The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

491.    If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, then NFL players, such as Plaintiffs, would not have suffered from the subject condition or the

effects of that condition, would have recovered more rapidly, or would not have suffered long-term brain damage, dementia, and depression and related to dementia and CTE.

492.    Under all of above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs.

493.    The NFL committed acts of omission and commission, which collectively and severally, constituted negligence.  The NFL's negligence was a proximate and producing cause of the personal injuries and other damages suffered by Plaintiffs.

494.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## THIRD CAUSE OF ACTION

### FRAUD

#### (As Against the NFL)

495.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein at length.

496.    From 2005 through June of 2010, the NFL made through its "Mild Traumatic Brain Injury Committee" and others, its agents, material misrepresentations to its players, former players, the Congress and the public at large that there was no link between concussions and later life cognitive/brain injury, including CTE and its related symptoms.

497.     Material misrepresentations were made by members of the NFL's committee on multiple occasions, including but not limited to testimony given at congressional hearings and the "informational" pamphlet which they issued to the players.

498.     The material misrepresentations include the NFL's remarks that the Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

499.     The material misrepresentations include NFL's remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

500.     The persons who made the misrepresentations as agents of the NFL and the NFL knew they were false when they were made.

501.     The persons who made the misrepresentations as agents of the NFL and the NFL intended to defraud, among others, the Plaintiffs in this action.

502.     The Plaintiffs, among others, justifiably relied on these misrepresentations to their detriment in getting care for their injuries.

503.     The NFL knew, or should have known, that the Plaintiffs would rely on the NFL's misrepresentations.

504.     The Plaintiffs, among others, were damaged by these misrepresentations.  Among other things, they require increased home care, loss of consortium, loss of employment, medical costs and pain and suffering.

505.     As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## FOURTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

### (As Against the NFL)

506.    Plaintiffs incorporate by reference the foregoing paragraphs as if set fully herein at length.

507.    The NFL's MTBI Committee concealed the risks of head injuries to Plaintiffs, and the risk to Plaintiffs if they returned to the playing field before making a proper recovery from their injuries.

508.    The NFL's MTBI Committee, through misleading public statements, published articles and the concussion pamphlet issued to players, concealed and downplayed known long-term risks of concussions to NFL players.

509.    The concussion pamphlet clearly created player reliance. The NFL stated that "[w]e want to make sure all N.F.L. players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."

510.    Further concealment of material information occurred in January 2010. Dr. Casson provided oral and written testimony at the January 2010 congressional hearings.  He continued to deny the validity of other studies.

511.    The NFL failed to acknowledge, either publicly or to its players, the clear link between concussions and brain injuries beings suffered by NFL players.

512.    The NFL failed to acknowledge, either publicly or to its players, the linkage between playing football and long-term brain injuries.

513.    The NFL willfully concealed this information from Plaintiffs in order to prevent negative publicity and increased scrutiny of its medical practices.

514.    The NFL knew that Plaintiffs would rely on the inaccurate information provided by The NFL.

515.    Plaintiffs relied on this inaccurate information during their NFL careers.

516.    As a direct and proximate result of The NFL's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and multiple economic losses.

517.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (As Against the NFL)

518.    Plaintiffs incorporate by reference the foregoing paragraphs as if set fully herein at length.

519.    The NFL misrepresented the dangers that NFL players faced in returning to action too quickly after sustaining a head injury.   The NFL's MTBI Committee, through public statements which it knew or should have known were misleading, published articles and issued the concussion pamphlet to its players, and downplayed and the long-term risks of concussions to NFL players.

520.    Material misrepresentations were made by members of The NFL's committee on multiple occasions, including but not limited to testimony at congressional hearings and the "informational" pamphlet issued to players.

521.    The misrepresentations included The NFL's remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

522.    The NFL's material misrepresentations also included The NFL's criticism of legitimate scientific studies that illustrated the dangers and risks of head injuries.

523.    The NFL made these misrepresentations and actively concealed adverse information at a time when they knew, or should have known, because of their superior position of knowledge, that Plaintiffs faced health problems if he were to return to a game too soon.

524.    The NFL knew or should have known the misleading nature of these statements when they were made.

525.    The NFL made misrepresentations and actively concealed information with the intention that Plaintiffs would rely on the misrepresentations or omissions in selecting their course of action.

526.    As a direct and proximate result of The NFL's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and have suffered multiple economic losses.

527.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## SIXTH CAUSE OF ACTION

## CONSPIRACY

### (As Against the NFL)

528.    Plaintiffs incorporate by reference the foregoing paragraphs as if set fully herein at length.

529.    The NFL actively and deliberately conspired with its team members and/or independent contractors, who were directed to continuously discount and reject the causal connection between multiple concussions suffered while playing in the NFL.

530.    This conduct between the NFL and others was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs.

531.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.

## SEVENTH CAUSE OF ACTION

## STRICT LIABILITY FOR DESIGN DEFECT

### (As Against Riddell Defendants)

532.    Plaintiffs incorporate by reference the foregoing paragraphs as if set fully herein at length.

533.    At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the

foreseeable risk of concussive brain injury. The design defect includes, but is not limited to the following:

(a)     Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(a)     Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

(b)     Negligently failing to properly and adequately test the helmet model;

(c)     Other acts of negligence that may be discovered during the course of this matter; and

(d)     Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury.

534.    The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

535.    At all times, the helmets were being used for the purpose for which they were intended.

536.    The Riddell Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants.

537.     As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.

## EIGHTH CAUSE OF ACTION

## STRICT LIABILITY FOR MANUFACTURING DEFECT

### (As Against Riddell Defendants)

538.     Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

539.     At the time the helmets were designed, manufactured, sold and distributed by the Riddell Defendants, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury.  The Riddell Defendants' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

(a)     Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(b)     Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

(c)     Negligently failing to properly and adequately inspect and/or test the helmet model;

(d)     Other acts of negligence that may be discovered during the course of this matter; and

(e)     Failure to warn Plaintiffs that its helmets wouldn't protect against concussive brain injury.

540.    The manufacturing defect was a proximate and producing cause of the personal injuries suffered by Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

541.    The Riddell Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and producing cause of the personal injuries and other damages, including but not limited to, economic damages and non-economic damages.  A safe alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants.

542.    As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.

## NINTH CAUSE OF ACTION

## NEGLIGENCE

## (As Against NFL Properties)

543.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein at length.

544.    NFL Properties breached its duty to ensure that the equipment it licensed and approved were of the highest possible quality and sufficient to protect the NFL players, including Plaintiffs, from the risk of concussive brain injuries.

545.    NFL Properties breached its duty by licensing the Riddell Defendants' helmets, and approving and/or requiring the use of the helmets for the NFL players, knowing or having reason to know that the helmets were negligently and defectively designed and/or manufactured.

546.    As a result of these breaches by NFL Properties, Plaintiffs suffer personal injuries as a result the long-term health effects of concussive brain injuries.

547.    As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from NFL Properties, LLC in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.

## TENTH CAUSE OF ACTION

### FAILURE TO WARN

#### (As Against Riddell Defendants)

548.    Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

549.    The Riddell Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the helmets.

550.    The Riddell Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

551.    The Riddell Defendants failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

552.    The Riddell Defendants knew that these substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects.

553.    Plaintiffs neither knew, nor had reason to know of the existence of the aforementioned defects, or increased risks of harm.

554.    Plaintiffs were using the helmets in a reasonably foreseeable manner at all times.

555.    Plaintiffs' damages were the legal and proximate result of the actions of the Riddell Defendants who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the foreseeable use of their products.

556.    The Riddell Defendants' failure to warn caused the Plaintiffs' personal injuries.

557.    As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from the Riddell Defendants, in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.


## ELEVENTH CAUSE OF ACTION

## NEGLIGENCE

## (As Against Riddell Defendants)

558.    Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

559.   The Riddell Defendants were negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

560.   The Riddell Defendants owed a duty of care to the Plaintiffs in their design, testing, manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of the helmets.

561.   The Riddell Defendants should have been well aware that since 1928 repeated blows to the head can lead to CTE, commonly known as "punch-drunk syndrome".

562.   The Riddell Defendants breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

563.   As a result of the Riddell Defendants' breach of duty, Plaintiffs have sustained permanent injury.

564.   For the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from the Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.

## TWELVTH CAUSE OF ACTION

### LOSS OF CONSORTIUM

### (As Against All Defendants)

565.   Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

566.     As a direct and proximate result of the carelessness, negligence and recklessness of all Defendants and of the aforesaid injuries to their husbands, the wife Plaintiffs have been damaged as follows:

    (a)    They have been and will continue to be deprived of the services, society and companionship of their husbands;

    (b)    They have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and

    (c)    They have been and will continue to be deprived of the earnings of their husbands.

567.     As a result of the injuries to Plaintiffs, wife Plaintiffs are entitled to damages from the Defendants, in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000.00.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, and each of them, as follows:

    1.    For compensatory and general damages according to proof;

    2.    For special and incidental damages according to proof;

    3.    For punitive damages according to proof;

    4.    For costs of the proceedings herein; and

    5.    For all such other and further relief as the Court deems just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment of the United States Constitution, Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: January 20, 2012

By: _____
GOLDBERG, PERSKY & WHITE, P.C.
Jason E. Luckasevic (Pennsylvania Bar No. 85557)
Jason T. Shipp (Pennsylvania Bar No. 87471)
1030 Fifth Ave.
Pittsburgh, PA 15219
Telephone: (412) 471-3980
Facsimile: (412) 471-8308


GIRARDI | KEESE
Thomas Girardi (California Bar No. 36603)
Graham LippSmith (California Bar No. 221984)
Celene S. Chan (California Bar No. 260267)
1126 Wilshire Boulevard
Los Angeles, California 90017
Telephone:  (213) 977-0211
Facsimile:  (213)481-1554

RUSSOMANNO & BORRELLO, P.A.
Herman J. Russomanno (Florida Bar No. 240346)
Robert J. Borrello (Florida Bar No. 764485)
150 West Flagler Street - PH 2800
Miami, FL 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103


*Attorneys for Plaintiffs*